ORANGE COUNTY.—HON. GILBERT O. HULSE, SURROGATE.—
JANUARY, 1870.

## COLHOUN *v.* JONES.

*In the matter of the Probate of the last Will and Testament
of* JOHN CLARKSON COLHOUN, *deceased.*

In determining the testamentary condition of the testator's mind, the
court will take into consideration the fact, though not controlling,
that the will disinherits all the testator's relatives, and gives his
estate to a stranger, with whom he had been acquainted but a few
months.

Previous wills made by a testator are admissible on the question of
undue influence, as showing that the testator was easily influenced
by those who had his confidence, or that he was under the influence
of a delusion.

Where it appeared that the testator's will was under the clear delusion,
unfounded in fact, that his father and sister (his only heirs at law,)
hated him on the ground of a difference of religious belief, that his
father had treated him harshly and had driven him from home, and
had refused him the means of an education, and had wanted to get
him out of the way, for the sake of his property,—*Held,* evidence of
monomania, or insane delusion, it appearing that the will was the
direct offspring of such delusion, or was affected by it.*

A will made by a patient in favor of his physician, in whose house he
resides, and under whose care he was to the time of his death, is pre-
sumptively open to the imputation of undue influence. The burden
of proof is upon the latter, to show the contrary.

Fraud and undue influence may be inferred by circumstances.

THIS was a proceeding for the probate of the last will
and testament of John Clarkson Colhoun, deceased.

The deceased was the only surviving son of Com-
modore John Colhoun, of Philadelpia. He left surviv-
ing him, his father, and Rosalie Colhoun, his only sister.
His mother died in 1851. At the time of his death he
was about twenty-three, and his sister about sixteen
years of age. He left an estate valued at at least forty

---

* Compare the case of *Shaw's Will* post.

thousand dollars. At an early age his father placed him at a boarding school at Cornwall in this state, and continued him at various institutions of learning until some time in the year 1866. In the fall of that year young Colhoun went to Europe, and returned the following spring. For a short time after his return he remained at Mount Pleasant or Chestnut Hill, near the City of Philadelphia. In the month of June, 1867, with the knowledge and approval of his father, he secured a boarding place with Mr. Daniel T. Weed, who resides near the City of Newburgh, in this county. He was in failing health at this time, and being seriously ill while at Mr. Weed's, Dr. William Jones, a physician in the City of Newburgh, was called to attend him, and made him about twenty professional visits while he was there. On the 19th of August, 1867, Colhoun left Mr. Weed's and went to Dr. Jones' house. That evening he and the Doctor went to the city of New York together. They returned in company with each other the following evening, and from that time until Colhoun's death, which occurred October 16th, 1867, Colhoun remained at the Doctor's house. The will offered for probate bears date August 21st, 1867, and purports to be the last will and testament of the deceased. It is claimed that it was executed at the Doctor's house at the time it bears date, and by its terms the testator disinherits all those who would have succeeded to his estate, in case he had died intestate, and gave the entire estate to Dr. Jones.

The following objections were filed by the father and sister of the deceased, to the probate of the will:

First. The instrument produced is not the last will and testament of John C. Colhoun, deceased, and was not executed by him in the manner prescribed by statute.

Second. That the deceased was not of sound mind and memory at the time when he executed the alleged will, and that in executing the same, he did not act without restraint.

Third. The execution of said will was procured by fraud, and by undue influence.

Fourth. At the time of executing the alleged will, the deceased was laboring under an insane delusion.

THE SURROGATE.—After a careful consideration of the testimony given before me, and an examination of the law which is to be applied to the case, I am satisfied it is my duty to reject the will.

Upon the argument before me, it seemed to be conceded by the contestants that the will was executed in due form of law. I shall therefore consider one of the objections as out of the case. The grounds on which the will is rejected are involved in the remaining objections.

The statute provides that all persons except idiots, persons of unsound mind, and infants, may devise their real estate by a last will and testament, duly executed. It also provides, that if upon the proof taken it shall appear that such will was duly executed; that the testator, at the time of executing the same, was in all respects compctent to devise real estate and not under restraint; then the will and proof shall be recorded. It is not contended that Colhoun was an infant, or an idiot, or a lunatic; but it is insisted that he was so far unsound in mind, and was so entirely under the influence and control of Dr. Jones, in making the will, that the instrument is invalid.

I will first consider the question whether the testator was so far unsound in his mind that the will is invalid for that reason. He was not an idiot or a lunatic, but

it is said that he was afflicted with a form of insanity know as monomania   Monomaniacs are those persons who are insane upon some one or more subjects, whether it relate to one or more persons or things, and are apparently sane upon all others.   Such persons are competent to make a will unless the subject of their infirmity is involved in the making of it   The belief in the existence of mere illusions or hallucinations, creatures purely of the imagination, such as no sane man would believe in, is unequivocal evidence of insanity.   The persistent belief of a person in supposed facts, which really have no existence, except in his imagination, and his acting upon such belief, proves him, so far as such acts are concerned, to be acting under a morbid delusion.   Such a delusion is partial insanity.   Whenever it appears that the will is the direct offspring of such partial insanity, it must be regarded as invalid, though the general capacity of the testator is unimpeached.   The subject of monomania, or partial insanity, has been the theme of much discussion, and great weight and consideration have been given to it by the ablest medical writers and jurists.   See *Dr. Beattie's Treatise on Madness; Locke on Human Understanding; Dr. Francis Willis' Treatise on Mental Derangement; Phillips on Lunatics, Idiots, and Persons of Unsound Mind ; Dew* v. *Clark,* (3 *Addams Rep.,* 79) *; Hopper's case,* (33d *N. Y. Rep.,* 624); *Stanton* v. *Wetherwax,* (16 *Barb.,* 259).

In considering the condition of Colhoun's mind, we are permitted to take into consideration the fact that by his will he entirely disinherits all his relatives, and gives his entire estate to Dr. Jones, with whom he had been acquainted but a few months.

This fact is not controlling evidence of unsoundness of mind, for a testator, in every respect competent, has the right to disinherit both distant and near relatives;

yet the fact that he does so, taken in connection with other facts, may be entitled to considerable weight. (*Peck* v. *Cary*, 27 *N.Y.*, 9 ; *Clark* v. *Fisher*, 1 *Paige*, 171.)

It is insisted by the contestants that the testator was, for many years, addicted to the vice of masturbation, and that it had resulted in breaking down his bodily health and impairing his mental faculties. That the deceased was a victim of this vicious habit there is some proof. It is not necessary for me to recapitulate it.

Dr. D. Tilden Brown, the physician for the Bloomingdale Asylum for the Insane, in the City of New York, for the past sixteen years, and Dr. John P. Gray, for the insane Asylum at Utica, for the past seventeen years, were each sworn in this case, and described patients who had come under their care from the effects of this vice, and they concur in the statement that excessive indulgence in it may, and sometimes does, destroy both body and mind. Judging from the many facts proved in this case, I have no doubt but young Colhoun was the victim of this vice, and that to its indulgence he was largely indebted for the unfortunate condition of body and mind in which he was, at the time he made the will in question.

There is another piece of testimony which is not without its importance in the case. It was made to appear that within a brief space of time Colhoun made and executed four different wills. The first was made some time prior to July 26, 1867, but it does not appear what its provisions were. The second was made while he was boarding at Mr. Weed's, and bears date July 26, 1867. By this will he gave all his property to Mr. Weed's wife, who was a comparative stranger to him. The third was made at Dr. Jones' house, on the 19th of August, 1867, but what its provisions were did not transpire on the trial, except that it was made to secure

the Doctor. The fourth will is the one offered for probate, and is dated August 21, 1867. When considered by itself, this testimony may not be considered very important, yet it cannot but seem strange that one should execute so many wills within so short a period; and especially is it strange that within the space of one month he should make two wills differing so widely in their provisions as does the one in favor of Mrs. Weed, and that which is now offered for probate. I think the other proofs in the case justify the conclusion that Colhoun's condition of mind was such that he was easily influenced and controlled by any one who had the fortune to secure his confidence. Or it may be that these many wills were but the natural results of the delusion under which it is claimed the testator labored with regard to his father.

The testimony given on the trial, showing that Colhoun harbored intensely hostile feelings towards his father, at the time he executed the last will, is very strong. It is unnecessary to quote it at length, but it is sufficient to state that the fact was established by numerous witnesses. He justified this hostility on various grounds. He charged that his father and sister were Catholics—that his father hated him because of his Protestant faith, that his father had treated him harshly—that he had driven him away from home—that he had refused to aid him in getting an education—that they had not been on good terms for a number of years—and his father wanted to get him out of the way, so that he could get hold of his property, &c. It was clearly shown that there was no foundation for any of these charges, and that no reason existed why the testator should have entertained any of these beliefs against his only surviving parent. That the testator believed in the truth of what he said I have no doubt; that the facts which he asserted

had no real existence is equally clear to my mind; and that the will was the direct offspring of the delusion, no one can deny. We therefore have the precise condition of the monomaniac, as shown by the evidence of Drs. Gray and Brown, who concur with the most enlightened and able medical writers on the subject.

Dr. Gray testifies: "An insane delusion is the belief in the existence of that which has only an existence in the imagination of the person. It is the result of disease. "

It was shown that as late as the month of July, 1867, and while young Colhoun was boarding at Mr. Weed's, he saw his father in the City of New York. They met and parted on the most friendly terms. It appears that immediately afterwards, young Colhoun conceived the idea that his father was, and long had been, an enemy to him. He is at this time in ill health. He declares that his father shall never have any of his property. He believes in the truth of the charges he makes against him, against all evidence. He makes a will disinheriting his father, on the express ground that he believed in the facts which had an existence only in his imagination. He was laboring under what may be termed an insane delusion, or partial insanity. The authorities are clear that whenever a will is the direct offspring of such a delusion, or rather, where its provisions are affected by it, the instrument is invalid. Believing as I do, that Colhoun was laboring under an insane delusion in regard to his father, and that he was controlled by it in making the will in question, I refuse to admit it to probate for that reason.

I will next consider whether the testator was the victim of undue influence, or rather whether he was under restraint in making the alleged will.

This is the case of a will made by a patient in favor

of his physician; and a strong presumption arises against its validity. · The case has not been relieved from such presumption by the testimony; but on the contrary, all the facts and circumstances proved, tend to strengthen and confirm it. It is necessary that a person standing in the confidential relation which Dr. Jones occupied to the testator, should, when he comes into court, seeking to establish such an instrument as this, show honest motives and fair dealing, and that no advantage had been taken by him of one who was so completely in his power. This Dr. Jones has failed to do. Instead of showing fair dealing, and rebutting the presumption which arises against the will, the testimony of the Doctor, and of the other members of his family, is of such a character as to force me to the conclusion that Colhoun was completely under the doctor's control and influence, and that the doctor exercised that control and influence to make himself the sole beneficiary under the will. How or in what particular way this was done, does not distinctly appear. It is true that fraud and undue influence must be proved; but they may be inferred and established by circumstances. If they are not established in this case, by the circumstances which surround it, then I think it difficult to conceive of one in which it could be done, except by direct and positive testimony.

It is well to advert to a few facts under this branch of the case. Colhoun boarded at Mr. Weed's, from June 11th, until August 19th, 1867. During that time Dr. Jones, with whom the deceased had no previous acquaintance, was called to attend him as his physician, and made him some twenty professional visits. While making these visits, the doctor learned that Colhoun had property to a large amount, and frequently talked with him on the subject of making a will. He knew of the execution of the Weed will, and was informed that his

patient had willed his entire estate to Mrs. Weed.  He
soon after persuaded his patient to stay at his house for
a few days, and immediately afterwards boasts to one
of the witnesses that he had succeeded in getting him
from Mr. Weed's.  On the very day following, Colhoun
leaves Mr. Weed's, and goes again to the doctor's house.
He at once makes a will in the doctor's favor.  That eve-
ning they go to the City of New York, in company with
each other, and the next day are found at the office of
Colhoun's attorney, getting information concerning Col-
houn's estate.  They return to the City of Newburgh, on
the evening of that day, and again Colhoun goes to the
doctor's house.  The following day the will offered for
probate is drawn and executed, and the first one made in
the doctor's favor is destroyed.  The precaution is taken
to have two medical gentlemen, Drs. Kerr and Mills,
friends of Dr. Jones, witness the execution of the last
will.  The executors named in it are strangers to the
testator, but old acquaintances of the doctor.  From
that time, Colhoun is taken charge of, and watched day
and night, by Adolphus Jones, who is a son of the doc-
tor, and who had full knowledge of the making of the
will.

After the fact of Colhoun's whereabouts and condi-
tion became known, many of his friends and acquaint-
ances called to see him, but were either denied admis-
sion or admitted with reluctance.  Notwithstanding Dr.
Jones well knew who Colhoun was, where his father
resided, and that his patient must soon die, he never
thought it worth his while to make known to the father
the condition of the son, until it was too late to remove
the patient from his house, or to undo what had been
done.  And when Commodore Colhoun, after being
notified by the doctor that Clarkson was about to die,
called, in company with Judge Taylor, to see him, the

doctor questioned the propriety of letting him go to the bedside of his dying boy.

Other facts might be referred to, but these are sufficient to justify the conclusion that Dr. Jones acquired and exercised complete control over his patient. He knew Colhoun's condition, and it is plain to me, that having become aware of the execution of the will in favor of Mrs. Weed, he induced the testator to leave Mr. Weed's and take up his residence with him, and to make the will offered for probate.

A will made by a patient in favor of his physician, under the circumstances proved before me, cannot be said to have been made without restraint. The law presumes that the will was procured by undue and improper influences, and there certainly is nothing in the facts of the case which repels that presumption. (2 *Milne and Craig*, 269; 1 *Redf. on Wills*, 513–534; *Dean* v. *Negley*, 41 *Penn.* 312; *Gilneath* v. *Gilneath*, 4 *Jones Eq.*, 142; *Wilson* v. *Moran*, 3 *Bradf.* 172; *Swinburne on Wills*, part 7, chap. 4; *Willard's Equity Jur.* 169, *et seq*; *Dent* v. *Bennett*, 7 *Sim.*, 539.)

The case last cited has a peculiar analogy to the one under consideration.—There an agreement was entered into between Dent, a man of eighty-six years of age, and Bennett, his physician, whereby the latter agreed to render him faithfully his medical services, whenever required during the lifetime of the patient, for which, and for other services, Dent agreed that Bennett should have £25,000 at his decease, payable out of his estate. After the death of his patient, the physician brought an action against the executor on the agreement, and the latter filed a bill to restrain the suit at law, and to set aside and have cancelled the agreement, on the grounds that it had been obtained from a man of advanced age, and without advice, and by the undue influence of the

physician over his patient. The Vice-Chancellor, in his opinion, used the following language:

"I must say, that from the beginning it has struck me with very great surprise, that any one who had the power of withdrawing such a case as this from the attention of the public should have allowed it to be discussed in public. In my opinion, however, as the case now stands, nothing can be more useless than to allow the action (at law) to proceed; for it is plain on the face of the agreement, that it is not worth one farthing in point of law. * * It is an agreement framed on the foundation of having the medical assistance of the defendant continued, and not on the ground that the connection between the two as patient and medical adviser is to be dissolved. It is plain that the existence of such an agreement is a direct premium to the medical adviser to accelerate that death upon the happening of which he is to have £25,000. * * * And it seems to me, that wherever you find the relation of employer and agent existing in situations in which, of necessity, much confidence must be placed by the employer in the agent, then the case arises for watchfulness on the part of the court that that confidence shall not be abused; and I can hardly conceive a more glaring instance of the abuse of confidence, than the taking by Mr. Bennett, in the manner represented in his answer, this sort of agreement from Mr. Dent."

I feel that I am fully sustained by this case. The case under consideration shows a still greater necessity for adhering to the rule laid down in *Dent* v. *Bennett.* Here the patient was ill, and went to the house of the physician, where he made the will, and never left that house after the will was executed. During all this time he was under the direct influence of Dr. Jones, who, to quote the language of the Vice-Chancellor, in the case

last cited, had a direct interest " to accelerate that death on the happening of which " he was to get a large estate. Authority, reason, and conscience, alike dictate the conclusion I have arrived at to reject the will, upon the ground that at the making thereof the testator was under restraint, as well as upon the other ground, to wit, partial insanity.

Decree accordingly.