ORANGE COUNTY.— HON. R. C. COLEMAN, SURRO-
GATE.—October, 1885.

MORSE *v.* SCOTT.

*In the matter ˙ of the application for probate of. a
paper propounded as the will of* JOHN S. SAM-
MONS, *deceased.*

Evidence of the existence of insane delusions, in the mind of an alleged
    testator, is not countervailed by proof of the possession of business
    capacity in ordinary transactions.
Upon proof of a delusion naturally affecting the testamentary act, the
    *onus* of showing that the former did not exist when the latter was
    performed is thrown upon proponents.
Decedent, who died at the age of eighty years, unmarried, and leaving him
    surviving a sister, nephews and nieces, grew up a farm laborer, never
    learned to read or write, had naturally a weak and superstitious mind,
    and often exhibited eccentricities of behavior, though his physicians
    and bankers testified that he was rational and shrewd in his business
    transactions.  In middle-life, he became possessed with a dominating
    purpose to cause his body to be preserved to the end of time, to effec-
    tuate which he purchased a metallic coffin, declared by him to be made
    of wood and iron melted together, built a vault upon his farm for its
    reception, and, because his relatives would not survive for the requisite
    period, bestowed his entire property upon the trustees of a church,
    though himself neither philanthropic nor religious, as an inducement
    to them to undertake the trust of perpetually caring for his resting
    place and remains.—
*Held,* upon all the evidence as to testator's life, character, and declara-
    tions, that the will, though perverse and unreasonable, in view of his
    ties of relationship, could not be rejected upon that ground; but that
    probate must be refused for the reason that, at the time of execution,
    he was controlled by the insane delusion that his body was to be pre-
    served during all time.

PETITION for the probate of decedent's will, pre-
sented by James Scott, therein nominated executor

thereof; opposed by Sarah D. Morse and others, decedent's heirs at law.

W. J. WELCH, *and* B. R. CHAMPION, *for executors, proponents.*

HENRY WIGGINS, *and* H. A. WADSWORTH, *for contestants.*

THE SURROGATE.—Unless it appears, from the testimony, that John S. Sammons was influenced in making the instrument propounded as his last will and testament by an insane delusion, the will should be admitted to probate, all other legal requisites having been sufficiently proved. The law permitted him to dispose of his own as he desired, whether that desire was induced by a ridiculous fancy to preserve his tomb, or a sincere wish to benefit the religious body selected by him as his principal beneficiary, although in so doing he excluded those recognized by our statutes as his heirs, provided only that such desire is the outcome of a sane purpose.

An insane delusion is defined by Dr. Gray, in the Calhoun will case (2 *Redf.*, 40), as a belief in the existence of that which has only an existence in the imagination of the person. Dr. Williams in this case says : "It is a false belief that governs and controls the individual in his actions." By the law of this State, a person having insane delusions may make a valid testamentary disposition of his property when such delusions have not influenced the mind of the testator in making the disposition. Van Guysling v. Van Kuren (35 *N. Y.*, 70) is a case in point. In that case, the testatrix believed that she saw and was interfered with by "spooks" and witches; but that

belief did not enter into, or apparently affect the manner in which she disposed of her property. She selected some of her relatives, in preference to others equally related to her. The more common form of insane delusions, which have been held by the courts, to have vitiated wills, is that one which led the testator to believe that those, who by nature were his protectors and should have been the recipients of his bounty, were seeking to injure and kill him, and believing in this delusion, cut off such persons from sharing in the estate.

Judge DENIO well says, in Seamen's Friend Society v. Hopper (33 *N. Y.*, 619, 624): "On questions of testamentary capacity, courts should be careful not to confound perverse opinions and unreasonable prejudices with mental alienations." There is no question but that John S. Sammons was a man full of perverse opinions and unreasonable prejudices, and his will must also be regarded as perverse and unreasonable when viewed in connection with his life, character and ties of relationship, for he was neither benevolent, philanthropic or religious. He had a sister and nephews and nieces, for all of whom he apparently entertained friendly feelings; and yet, by this will, he would disinherit them all and give his property to a church society, not for the purpose of advancing the cause of religion, but, as he himself says, for the purpose of having his vault preserved to the end of time. Now, was this only the result of a freak or whim, or was it the result of some mental disturbance?

In order to determine this, we must consider the

character, habits and life of the man : he was an ignorant man—had never learned to read or write, except his name—had naturally a weak and superstitious mind—was never married—grew up a farm laborer—in middle life inherited a farm from his mother, which is about all the property he ever had, except as he has accumulated and saved from the products of this farm—thought he heard a voice, while in the field one day shortly before his mother's death, telling him of that event; and when himself over fifty years of age, while ploughing in a field, found a stone scraped by the plough with marks, which he thought were the figures, 52, indicating his own death on his fifty-second birthday—hearing then, or at some other time, a voice in the air, which foretold the same event—by reason of which he gave public notice that he was to die on that day, so that, according to one witness who was present, some two hundred people were gathered about his house—he had in the meantime built for himself a vault upon his farm, directed an undertaker to be present, and had purchased and brought to his house a metallic coffin, which he told one witness was made of wood and iron melted together, and which he told several witnesses would preserve his body to the end of time. He was, also, at this time, greatly concerned by the threat of a neighboring doctor, that, if he died at this time, he would scrape the flesh off his bones, wire them together, put a ring in his head, and hang him up to fight the four winds.   Just how much this threat had to do with the building of the vault and the buying of the coffin is not clear; but he did, after

that, make a will in which he gave his body to a trusted friend to be preserved.  For a time after the day fixed for his death, he seemed shy of meeting people — was generally, however, boisterous, and would frequently shout to people passing by his house on the highway, whether he knew them or not, and stop them—would ask them where they were going and other questions—would sometimes, immediately after asking a blessing, break out in oaths—was generally profane and often indecent in his language.  He buried two horses on his farm, and erected tombstones at their graves.  At one time, he bought a coffin, similar to his own, for his dog, before it died, to test the preserving qualities of the coffin ; and at another time, he also got a coffin for his cat ; and, after they died, placed their dead bodies in these coffins, and kept them about the house until the flesh became putrid, and, when expostulated with on the subject, objected to burying them, and said he thought the coffins ought to have preserved the bodies better. He made a number of wills, in all of which it would seem some provision was made for perpetually maintaining his vault, and in one of which provision was made for a public burying ground on his farm for animals.

I do not mention all these facts because I think them all evidences of insanity; in fact, I think the most of them by themselves are not ; but they do show a very weak and eccentric mind, and one in which delusions might readily find lodgment, which might in time become fixed delusions so as to control his actions.

His habits of life were to the last degree filthy. He was, at the same time, niggardly of his money, and wasteful about his house and farm. During life, he gave little or nothing to the church or any other cause, and only paid for work done for him when he could not avoid it, or was compelled to do so.

On the other hand, by the testimony of many of his neighbors, of his tradesmen, of his bankers and of physicians, who knew him well, it appears that, while acknowledged by them to be an eccentric man, he was, in their judgment, rational in all his acts, accustomed to buy and sell at the best advantage, doing his banking and other business correctly and understandingly, and continued so to be and to do until the time of the accident which occasioned his death, when he was about eighty years of age. While this may be and probably was true, so far as their intercourse with him was concerned, it is well settled that evidence of delusions is not countervailed by evidence of business capacity as to ordinary business transactions. It is also held that, when delusions are shown before the execution of the instrument, naturally affecting its provisions, the burden is shifted upon the proponents to show that they did not exist when the instrument was executed (Shaw's Will, 2 *Redf.*, 107, 126, and cases there cited).

I am entirely satisfied that, before the execution of the will offered for probate, John S. Sammons had at least two well settled insane delusions. One was that he was to die on his fifty-second birthday. While it is true that he did not die then, and therefore, could not well, after that, entertain the delusion, still he

himself frequently said, in reference to the matter, that he was only living on borrowed time. And it is, also, true that this delusion probably did not affect the provisions of this will. Its principal importance to my mind is that it shows that, having had such a delusion, there is greater probability of his having others on kindred subjects.

The other delusion was the belief that his body was to be preserved to the end of time—either by his coffin or by some other means. Whatever matters he may have been mentally sound upon—however suc cessfully he may have conducted his farm, or traded or correctly done business—he never gave up the idea that his body was to be preserved to the end of time; and therefore the necessity, in his mind, of having perpetually a suitable place for its protection. For this purpose, he built a vault upon his farm and then seeks some means of having that vault always cared for. He declines to make his relatives trustees for that purpose, for, as he says: they would not live to the end of time. At one time, he thinks of town officers and their successors, as trustees, but finally selects the trustees of the church, which he had occasionally attended, and their successors, as the proper persons to take care of the vault, and made the farm, upon which it is situated, and his other property, an inducement to undertake the trust.

When the person who was about to draw his will sought to persuade him to remember his relatives in the disposition of the property, he makes no objection to them on account of unfitness, dislike or animosity; but seemed intent only on one object, to

provide a means for the preservation of his vault, and said of his nephews in that connection, "Dody, will they live for ever?" Both witnesses to the will say that he said that one of the principal reasons for giving his property to the church was to have his vault cared for. The person who drew the will says his whole bent seemed to be to have his vault preserved.

Was this purpose, from which nothing could divert him, the desire of a sound mind? If it was, the law will uphold it, whether done to indulge a whim or to gratify his vanity. If, however, the purpose was induced by the insane delusion that his body was going to be preserved to the end of time, and he was thereby induced and influenced to provide and perpetually maintain this vault for that reason, then the will is the result of an insane delusion, which controlled his judgment and misled his understanding in relation to the subject upon which it was acting, and must, therefore, be regarded as invalid, because it does not express the will of a testator of a sound, disposing mind.

After carefully considering the whole case, I have come to the conclusion that John S. Sammons, at the time of making the will, was controlled in making it by the insane delusion that his body was going to be preserved to the end of time. The will, therefore, will not be admitted to probate.

Having reached this conclusion, it will not be necessary for me to pass upon the question of the validity of the devise to the church.