QUEENS COUNTY.—HON. A. N. WELLER, SURROGATE.— March, 1888.

BANTA *v.* WILLETS.

*In the matter of the application for probate of a paper propounded as the will of* BRIDGET HARROLD, *deceased.*

The rule that undue influence, exerted to procure a testamentary disposition, must be sufficient to overcome free agency is limited to cases where the testator and his influential adviser stand upon a level, and does not apply where there is a confidential relation, and the latter occupies a dominating position.

The suspicion with which the law views a devise or bequest to a physician, a counsellor, or a guardian, from his patient, client or ward, is likewise indulged as between a master and a menial domestic servant.

While it is true, in every instance, that the influence alleged must be proved, the existence of such a relation, taken in connection with the fact of an unnatural disposition, shifts the *onus* to the shoulders of the one seeking to sustain the will.

Marx v. McGlynn, 88 *N. Y.*, 370—compared.

The will of decedent, who had been a servant in her employer's family almost twenty-nine years, and was unable to read or write, was made more than fourteen years before her demise, and disposed of her little all, consisting of her claim for unpaid wages for nearly the entire period, in somewhat elaborate provisions, in favor of her mistress, W., and descendants, to the exclusion of her own niece, her only next of kin, to whom she had ever been devotedly attached, and had stated that she intended to leave her property.

There was evidence on the part of proponent, to show that decedent, at the time of execution, was confined to her bed by illness, and expressed a desire to make a will, stating her wish to leave her money where she

had earned it; that proponent protested against such a disposition, but, at length yielding, procured the attendance of witnesses and a scrivener, and assisted decedent from her couch to the dining-room, where the document was drawn and subscribed.  It was then taken by proponent and placed in her strong box, where it remained until she produced it for probate.—

*Held,* that the efficiency of proponent's family, in respect of the genesis, and solicitude for the preservation, of the will were too great to warrant the court in ignoring the presumption which the law raised against its validity; and that probate must be refused.

APPLICATION for probate of will.   The facts are stated in the opinion.

THE SURROGATE.—This case is an extraordinary one.   A servant girl's will is offered for probate by her employers' family.   The will is contested by Mary Banta, decedent's niece and her only next of kin and heir at law.

The decedent was a servant of Isaac W. Willets, of North Hempstead, and had been in his service, as a domestic, for nearly twenty-nine years.   She came from Ireland about thirty-three years ago, and for the first three years found a home with her sister, a Mrs. Pendergast, the mother of contestant, Mary Banta ; and while she was making her home at her sister's the contestant was born.   Decedent nursed and cared for contestant during her early infancy, the mother being sick most of the time.   Decedent and contestant were much attached to each other, and a correspondence was kept up between them down to the day of decedent's death.   Contestant visited decedent occasionally, and occasionally decedent visited contestant ; and their attachments were never interrupted but continued unbroken to the end.   Dece-

dent before making the alleged will, and afterwards, frequently said to different people that contestant should have all she had when she died.

The decedent died November 13th, 1887, at the house of her master, Mr. Willets; and after her death a will was produced by the mistress of decedent, made more than fourteen years before her death. By this will, decedent bequeathed to Emma Willets, a daughter of her master $100, and to Alice W. Titus and Charles W. Sherwood, grandchildren, $50, each, directing the principal to be invested, and the accumulations added to the principal until they arrived at twenty-one years of age, with a limitation over to their respective mothers, should they die before maturity. All the rest and residue she gave to the wife and son of her master, and appointed her master and Oliver Titus, a cousin of Mrs. Willets, executors.

The origin of this will is not very clearly shown. Mrs. Willets, one of the chief beneficiaries, says that deceased was taken sick with an intermittent fever, and expressed a desire to make a will, saying she had earned her money there, and she wanted to leave it with the family. Mrs. Willets says she protested, but communicated Bridget's desire to her husband, Mr. Willets, who went to Roslyn and got a Mr. Hicks to come up and draw the will. Mr. Hicks was a friend of the family but not a lawyer. Mrs. Willets also states that, when Mr. Hicks, the writer of the will arrived, she went upstairs to decedent's room, got her up out of a sick bed, and assisted her down stairs into the dining room, where the will was drawn and executed, she being in and out of the room during the time.

Mr. Hicks, the writer of the will, witnessed it, signing the name of the decedent for her, she not being able to read or write. The other witness was Mr. Gibson, a neighbor, since deceased. How he came to act as a witness does not distinctly appear. Mrs. Willets says she thinks her husband went for him, but she did not hear decedent request any one to go for him. After the will was executed, Mrs. Willets, one of the chief beneficiaries immediately took possession of the instrument, put it in her strong box, and has kept it ever since, the decedent never seeing it again, and never asking to see it.

The decedent came into the employ of the Willets family as a common domestic, and continued in that menial capacity down to the day of her death. Her wages were five dollars per month in winter, and six dollars in summer. She did not take up her wages as they became due, only occasionally receiving small sums as needed from time to time, and all the estate, left by decedent at her death, was the amount due her as a servant to this family, who were her sole beneficiaries. No settlement had taken place between decedent and her employers, and no one on the hearing seemed able to tell how much was due her. At the time the alleged will was drawn, fourteen years before her death, decedent asked Mrs. Willets how much was coming to her, and she was told that she had not figured it up, and could not tell exactly, but she supposed it was about five or six hundred dollars. The decedent was weak, simple minded, ignorant and taciturn, having no acquaintances and receiving no

visitors, with the exception of her niece, Mary Banta, and her brother-in-law Mr. Pendergast.

A will made by a servant bequeathing to her master's family all she has in the world, which consists merely of the wages due from her master, challenges suspicion, and when reinforced by the fact that the will is at variance, with decedent's expressed intention, both before and after the date of the will, and is likewise opposed to the dictates of nature and justice, the presumption is that it was the result of undue influence. It is true undue influence must be proved and not presumed, and ordinarily it will not be presumed from a motive nor opportunity to exercise it.    But where a weak, simple-minded servant girl, makes a will in favor of those who, for a quarter of a century, have dominated over her, and whose slightest commands she had been accustomed implicitly to obey, it shows such a subordinate confidential relation as will peculiarly imply the exercise of undue influence and authority over her, and the *onus* is changed at once ; all suspicions must be allayed, and it must appear, by clear and convincing evidence, that the will is the free, full and unbiassed act of decedent's own mind.

Undue influence may be exercised by physical coercion or by threats of personal harm and duress, by which a person is compelled really against his will, to make a testamentary disposition of his property. That kind of undue influence can never be presumed. It must be shown by evidence legitimately proving the facts.    But there is another kind of undue influence more common than that just referred to, and that is, when the mind and will have been overpowered

by the commanding position of another, so that the testator willingly and intelligently executed a will, yet, it was really the will of another, induced by the overpowering influence exercised upon a weak or impaired mind. Judge EARL, in Marx v. McGlynn (88 *N. Y.*, 370), says: "There are certain cases in which the law indulges in the presumption that undue influence has been used, and these cases are: where a patient makes a will in favor of his physician; a client in favor of his lawyer; a ward in favor of his guardian; or when other close confidential relationship exists. Such wills, when made to the exclusion of the natural objects of the testator's bounty, are viewed with great suspicion by the law, and strong proof should be required, besides the *factum* of the will, before the will can be sustained." This rule relative to lawyers, physicians and guardians applies with equal, if not greater, force to that of master and servant. Surely, if the law presumes undue influence where physicians or lawyers are made beneficiaries, it ought to indulge in the same presumption against a master, who has long dominated over a simple-minded menial.

The rule, that undue influence must be sufficient to overcome free agency, is limited to cases where the testator and legatee stand on a level. It does not apply where there was a confidential relation, the testator being dependent, and the beneficiary holding the dominating situation (Redf. Lead. Cas. on Wills, 522, *n.*; Tyler v. Gardiner, 35 *N. Y.*, 559; Kevill v. Kevill, 6 *Am. L. Reg., N. S.*, 79; Taylor v. Wilburn, 20 *Mo.*, 306; Marshall v. Flinn, 4 *Jones* [*N. C.*], *Law,*

199 ; Swinburne on Wills, 887 ; Matter of Smith, 95 *N. Y.*, 516 ; 1 Redf. on Wills, 515).

The learned counsel for the proponent, in his very able brief, says " there is no affirmative proof that the proponent or any other person, exercised any undue influence whatever upon the deceased." The answer to the suggestion is that, because of her menial, dependent position, and the dominating sway over her by the beneficiaries under the will, the law will presume undue influence, and the proponents of a will in such a case are bound, on applying for probate, to give some explanation of its unnatural character, and to disprove the legal presumption that it was the result of undue influence arising from the peculiar relations of the parties (Colhoun v. Jones, 2 *Redf.*, 34, 37, 38 ; 4 *id.*, 409 ; Estate of Sarah A. Peck, 27 *W. D.*, 157 ; Will of Demmert, 3 *Law Bull.*, 39). In the language of Surrogate ROLLINS (Case of Peck, *supra*) : " Fraud and undue influence will readily be inferred in such a case, unless all jealous suspicions are put to rest by satisfactory testimony." Who, outside of this family, ever heard Bridget say she intended to give all she had to them, or that she ever expressed any peculiar regard or affection for them ? Several witnesses swore that she stated that she intended her niece Mary Banta should have her property, but none that she intended her master's family should be her beneficiaries. Again, why should this feeble minded domestic think of making a will at all ? Persons of her humble walk in life are not given to making wills. Who put the idea into decedent's head ?

But the contents of the will most emphatically

stamp it as the will of another.  She gave $50 to
each of two of her master's grandchildren, with in-
structions that the legacies be invested, and the accu-
mulations added to the principal, until the children
arrive at the age of twenty-one years, and, in case of
their death before that period, a limitation over to
their respective mothers.  This is too comprehensive
a testamentary scheme, to be the product of the brain
of a poor domestic drudge, and was never evolved out
of her feeble mind unaided by some dominating influ-
ence outside of it.  But again, why should decedent
utterly ignore her niece Mary Banta, the only relative
she had in the world?  She was a sister's child, born
almost in her arms.  Naturally Mary Banta would
seem like her own offspring, and the proof shows that
she was much attached to her; that it continued to
the end, and that decedent on two or three different
occasions said to different people that Mary should
have what she possessed when she died.  What ex-
planation is there of the disregard of such natural
affections, manifested by this will?  Why such a
radical change from her previously as well as subse-
quently expressed testamentary intentions?  The sus-
picions of undue influence excited by the dependent
and dominating relations existing between the tes-
tator and her beneficiaries, and the sudden change of
her testamentary intentions have not been removed,
but, on the contrary, strengthened by the testimony
relative to the manner of the execution of the will.
Mrs. Willets told her husband to go after a man to
draw the will.  True, she says the deceased requested
it, but the fact remains that Mrs. Willets was the

prime moving spirit in bringing the will into being. She got the deceased up out of a sick bed and helped her down stairs to make the will. When the scribe arrived and as soon as it wàs executed, she takes possession of the will, and keeps it under lock and key until after decedent's death. The family had altogether too much to do with the making of the will, and have manifested too much interest in its preservation, to warrant me in ignoring the presumption which the law raises against it.

I, therefore, decline to admit the paper to probate.