Weller, S.
This case is an extraordinary one. A servant girl’s will is offered for probate by her employers’ family. The will is contested by Mary Banta, decedent’s niece, and her only next of kin and heir at law.
The decedent was a servant of Isaac W. Willets, of North Hempstead, and had been in his service, as a domestic, for nearly twenty-nine years. She came from Ireland about thirty-three years ago, and for the first three years found a home with her sister, a Mrs. Pendergast, the mother of the contestant, Mary Banta; and while she was making her home at her sister’s the contestant was bom. Decedent nursed and cared for contestant during her early infancy, the mother being sick most of the time. Decedent and contestant were much attached to each other, and a correspondence was kept up between them down to decedent’s death. Contestant visited decedent occasionally, and occassionally decedent visited contestant; and their attachments were never interrupted, but continued unbroken to the end. Decedent before making the alleged will, and afterwards, frequently said to different people, that contestant should have all she had when she died.
The decedent died November 13, 1887, at the house of her master, Mr. Willets; and after her death a will was produced by the mistress of decedent, made more than fourteen years before her death. By this will, decedent bequeathed to Emma Willetts, a daughter of her master $100, and to Alice W. Titus and Charles W. Sherwood, grandchildren, fifty dollars each, directing the principal to be invested, and the accumulations added to the principal, until they arrived at twenty-one years of age, with a limitation over to their respective mothers, should they die before maturity. All the rest and residue she gave to the wife and son of her master, and appointed her master and Oliver Titus, a cousin of Mrs. Willets, executors.
The origin of this will is not very clearly snown. Mrs. Willets, one of the chief beneficiaries, says that deceased was taken sick with an intermittent fever, and expressed a desire to make a will, saying she had earned her money there, and she wanted to leave it with the family. Mrs. Willets says she protested, but communicated Bridget’s desire to her husband, Mr. Willets, who went to Roslynand got a Mr. Hicks to come up and draw the will. Mr. Hicks was a friend of the family but not a lawyer. Mrs. Willets also states that, when Mr. Hicks, the writer of the will arrived, she went upstairs to decedent’s room, got her up out of a sick bed, and assisted her down stairs into the dinning room, where the will was drawn and.executed, she beingin and out of the room during the time. Mi’. Hicks, the writer of the will witnessed it, signing the name of the decedent *238 for her, she not being able to read or write. The other witness was Mr. Gibson, .a neighbor since deceased. How he-came to act as a witness does not distinctly appear. . Mrs. Willets says she thinks her husband went for him, but she did not hear decedent request any one to go for him. After the will was executed, Mrs. Willets, one of the chief beneficiaries immediately took possession of the instrument, put it in her strong box, and has kept it ever since, the decedent never seeing it again, and never asking to see it.
The decedent came into the employ of the Willets family as a common domestic, and continued in that menial capacity down to the day of her death. Her wages -were five-dollars per month in winter and six dollars in summer. She did not take up her wages as they became due, only occasionally receiving small sums as needed from time to time, and all the estate, left by decedent at her death, was-the amount due her as a servant to this family, who were-her sole beneficiaries. No settlement had taken place between decedent and her employers, and no one on the-hearing seemed able to tell how much was due her. At the time the alleged will was drawn, fourteen years before her death, decedent asked Mrs. Willets how much was coming to her, and she was told that she had not figured it up, and could not tell exactly, but she supposed it was-about five or six hundred dollars. The decedent was weak, simple-minded, ignorant and taciturn, having no acquaintances and receiving no visitors, with the exception of her-niece, Mary Banta, and her brother-in-law Mr. Pendergast.
A will made by a servant bequeathing to her master’s-family all she has in the world, which consists merely of the wages due. from her master, challenges suspicion, and when reinforced by the fact that the will is at variance, with decedent’s expressed intention, both before and after the date of the will, and is likewise opposed to the dictates of nature and justice, the presumption is that it was the result of undue influence. It is true undue influence must be proved and not presumed, and ordinarily it will not be presumed from a motive nor opportunity to exercise it. But where a weak, simple-minded servant girl makes a will in favor of those who, for a quarter of a century, have dominated over her, and whose slightest commands she had been accustomed implicitly to obey, it shows such a subordinate confidential relation as will peculiarly-imply the exercise of undue influence and authority over her, and the onus is changed at once ; all suspicions must be allayed, and it must appear, by clear and convincing evidence, that, the will is the free, full and unbiased act of decedent’s own mind.
Undue influence may be exercised by physical coercion *239 or by threats of personal harm and duress, by which a person is compelled really against his will to make a testamentary disposition of his property. That kind of undue influence can never be presumed. It must be shown by evidence legitimately proving the facts. But there is another kind of undue influence more common than that just referred to, and that is, when the mind and will have been overpowered by the commanding position of another, so that the testator willingly and intelligently executed a will, yet it was really the will of another, induced by the overpowering influence exercised upon a weak or impaired mind.
Judge Earl, in Marx v. McGlynn (88 N. Y., 370), says: “There are certain cases in which the law indulges in the presumption that undue influence has been used, and these cases are: where a patient makes a will in favor of his physician, a client in favor of his lawyer, a ward in favor of his guardian, or when other close confidential relationship exists. . Such wills, when made to the exclusion of the natural objects of the testator’s bounty, are viewed with great suspicion by the law, and strong proof should be required, besides the factum of the will, before the will can be sustained.”
This rule relative to lawyers, physicians and guardians applies with equal, if not greater, force to that of master and servant. Surely, if the law presumes undue influence where physicians or lawyers are made beneficiaries, it ought to indulge in the same presumption against a master, who has long dominated over a simple-minded menial.
The rule, that undue influence must be sufficient to overcome free agency, is limited to cases where the testator and legatee stand on a level. ' It does not apply where there was a confidential relation, the testator being dependent, and the beneficiary holding the dominating situation. Redf. Lead. Cas. on Wills, 522, n., Tyler v. Gardiner, 35 N. Y., 559; Kevill v. Kevill, 6 Am. L. Reg. (N. S.), 79; Taylor v. Wilburn, 20 Mo., 306; Marshall v. Flinn, 4 Jones (N. C.), Law, 199; Swinburne on Wills, 887; Matter of Smith, 95 N. Y., 516; Redf. on Wills, 515.
The learned counsel for the proponent, in his very able brief, says “there is no affirmative proof that the proponent or any other person .exercised any undue influence whatever upon the deceased.”
The answer to the suggestion is that, because of her menial, dependent position, and the dominating sway over her by the beneficiaries under the will, the law will presume undue influence, and the proponents of a will in such a case are bound, on applying for probate, to give some explanation of its unnatural character, and to dis *240 prove the legal presumption that it was the result of undue influence arising from the peculiar relations of the parties. Colhoun v. Jones, 2 Redf., 34, 37, 38; 4 id., 409; Estate of Sarah A. Peck, 27 Week. Dig., 157; Will of Demmert, 3 Law Bull, 39.
In the language of Surrogate Rollins (Case of Peck, supra), ‘ fraud and undue influence will readily be inferred in such a case, unless all jealous suspicions are put to rest by satisfactory testimony.”
Who, outside of this family, ever heard Bridget say she intended to give all she had to them, or that she ever expressed any peculiar regard or affection for them? Several witnesses swore that she stated that she intended her niece Mary Banta should have her property, but none that she intended her master’s family should be her beneficiaries. Again why should this feeble minded domestic think of making a will at all? Persons of her humble walk in life are not given to making wills. Who put the idea into-decedent’s head?
But the contents of the will most emphatically stamp it as the will of another. She gave fifty dollars to each of her master’s grandchildren, with instructions that the legacies be invested, and the accumulations added to the principal, until the children arrive at the age of twenty-one years, and, in case of their death before that period, a limitation over to their respective mothers. This is too comprehensive a testamentary scheme to be the product of the brain of a poor domestic drudge, and was never evolved out of her feeble mind unaided by some dominating influence outside of it. But again, why should decedent utterly ignore her niece Mary Banta, the only relative she had in the world? She was a sister’s child, bom almost in her arms. Naturally Mary Banta would seem like her own offspring, and the proof shows that she was much attached toiler; that it continued to the end, and that decedent, on two or three different occasions, said to different people that Mary should have what she possessed when she died. What explanation is there of the disregard of such natural affections, manifested by this will? Why such a radical change from her previously as well as subsequently expressed testamentary intentions? -The suspicions of undue influence, excited by the dependent and dominating relations existing between the testator and her beneficiaries, and the sudden change of her testamentary intentions, have not been removed, but, on the contrary, strengthened by the testimony relative to the manner of the execution of the will. Mrs. Willets told her husband to go after a man to draw the will. True, she says the deceased requested it, but the fact remains that Mrs. Willet was the prime moving spirit in bringing the *241 will into being. She got the deceased up out of a sick bed a,nd helped her down stairs to make the will. When the scribe arrived, and as soon as it was executed, she takes possesion of the will, and keeps it under lock and key until after decedent’s death. The family had altogether too much to do with the making of the will, and have manifested too much interest in its preservation, to warrant me in ignoring the presumption which the law raises against it.
I, therefore, decline to admit the paper to probate.